UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

JUDITH SCHAPER,

Plaintiff,

-against-

THE BRONX LEBANON HOSPITAL CENTER and CAROL WILSON,

Defendants.

---------------------------------------- x

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT**

Case No.: 17-cv-01246 (ALC)

Defendants, The Bronx-Lebanon Hospital Center (now known as BronxCare Health System) and Carol Wilson, submit the following Statement of Undisputed Material Fact to support their motion for summary judgment, as required by Local Rule 56.1(a):

## Introduction

1. The Bronx-Lebanon Hospital Center, now known as BronxCare Health System (the "Hospital"), is a large not-for-profit health care system serving the South and Central Bronx, with 972 beds. The Hospital's ER responds to 139,000 visits annually. The Hospital's President and Chief Executive Officer is Miguel A. Fuentes. (Nhambiu Decl. ¶ 5.)

2. The Hospital is an equal opportunity employer. (Nhambiu Decl. Ex. 1.)

## Plaintiff's Hiring at the Hospital

3. The Hospital hired the Plaintiff, Judith Schaper, as a patient transporter on May 6, 2013. (Nhambiu Decl. Exh. 7.)

4. As part of the Hospital's pre-hiring orientation process, Plaintiff on April 12, 2013 acknowledged receipt of the Employee Handbook and her obligation to read the Handbook. The Handbook included a Discrimination Complaints Policy, which states, in relevant part, "the

Bronx-Lebanon Hospital Center provides employees with a means to express concerns when they feel discriminated against and an internal compliant procedure to have those concerns objectively heard and corrective action taken when appropriate or necessary." (Nhambiu Decl. Exh. 1.)

5. The Policy then goes on to set forth a detailed procedure for making and handling discrimination complaints. Under this procedure, Complaint Intake Forms are available in the Human Resources Division or on the Hospital-wide intranet. Completed forms are to be returned to the Assistant Vice President of Human Resources or the Director of Labor Relations. Complainants will be contacted to discuss the complaint in detail, but all complaints submitted will be maintained in confidence. All complaints will be investigated. (Nhambiu Decl. Exh. 1.)

**Plaintiff Becomes a Patient Care Technician**

6. On March 9, 2015, Plaintiff was transferred to the position of patient care technician in the Hospital's Emergency Department. (Nhambiu Decl. ¶ 10.)

7. As a patient care technician, she received work assignments from the registered nurses in the Hospital's Emergency Department. (Nhambiu Decl. ¶ 11; Ramagahan Dep. at 19.)

8. The registered nurses in the Hospital's Emergency Department reported to assistant nursing care coordinators in the Department. (Nhambiu Decl. ¶ 11; Ramagahan Dep. at 19.)

9. The assistant nursing care coordinators reported to patient care managers in the Hospital's Emergency Department. (Nhambiu Decl. ¶ 12; Ramagahan Dep. at 19.)

10. From March through August 2015, the patient care managers in the Hospital's Emergency Department reported to Gagandra "Tony" Ramagahan, the Emergency Department's Assistant Nurse Manager. (Nhambiu Decl. ¶ 12; Ramagahan Dep. at 19.)

11. From March through August 2015, Tony Ramagahan reported to Margaret "Mairead" O'Regan, the Emergency Department's Nurse Manager. (Nhambiu Decl. ¶ 12; Ramagahan Dep. at 19.)

12. Although Mairead O'Regan was the Emergency Department's Nurse Manager, the decision whether to terminate an employee engaging in wrongful conduct rested with Jasen Nhambiu, the Hospital's Director of Labor Relations. (Nhambiu Decl. ¶ 13; O'Regan Dep. at 34.)

13. The Emergency Department's registered nurses, assistant nursing care coordinators, and patient care managers all had the ability to assign, re-assign, and change work and work areas to patient care technicians, based upon patient demand, staffing, and the needs of the Emergency Department. (Nhambiu Decl. ¶ 14.)

14. The Hospital required its Emergency Department patient care technicians to wear scrubs of certain types, appearance, and colors. The Hospital reserved the right to discipline patient care technicians who failed to comply with these uniform requirements or otherwise wore ill-fitting scrubs while providing patient care. (Nhambiu Decl. ¶ 15)

15. The Hospital had a customer services policy prohibiting its Emergency Department staff from publicly speaking languages other than English to each other in front of patients and visitors. (Nhambiu Decl. ¶ 16.)

**<u>The July 7, 2015 Incident</u>**

16. On July 7, 2015, Judith Schaper reported to work the 12:00am shift as a patient care technician in the Hospital Emergency Department. One of the nurses she was assigned to work with was Renee Praddy. The patient care manager for the shift was Defendant Carol Wilson. (Nhambiu Decl. ¶¶ 17-24.)

17. Late in the shift, the daughter of an Emergency Department patient suspected of having suffered a stroke told Nurse Praddy that she had asked Schaper to help her change her mother, who had soiled her diaper, and Schaper refused. (Praddy Dep. at 17-18; Wilson Dep. at 103-05.)

18. Praddy then went to speak about the issue with Schaper, who was on rounds going from patient to patient. Schaper categorically told Praddy that she was not going to assist the patient's daughter, and was not going to clean the patient. Praddy warned Schaper that the patient's daughter could complain about her refusal to change the patient, but Schaper told Praddy "I don't care she can do whatever she wants but I am not cleaning her." (Nhambiu Decl. Exh. 2; *see also* Praddy Dep. at 18-22; Wilson Dep. at 105.)

19. Ultimately, two nurses assisted the patient's daughter. (Nhambiu Decl. Exh. 2; Harris Dep. at 7-9.)

20. Praddy then brought the issue to Carol Wilson's attention, near the end of the shift, and told Wilson that the patient's daughter wanted to speak with Wilson. (Praddy Dep. at 23; Wilson at 103.)

21. Wilson then spoke with the patient's daughter, who told Wilson that her mother had been in the Emergency Department all night and had not been attended to by Schaper. (Wilson Dep. at 107-08.) Wilson asked the patient's daughter to write out a statement. (*Id.* at 118.)

22. In the statement, dated July 7, 2015, the patient's daughter wrote that she asked Schaper "if my mom could be changed because she uses diapers." Schaper responded that "she was busy doing EKG's and as soon as she was finished she would get back to me. So again I said

to her my mom is wet and she has not been changed all night, from after 8pm until after 5pm this morning." (Nhambiu Dep. Exh. 2.)

23. According to the patient's daughter, Schaper went on to state that "In the Emergency [Department], we don't do that, you will have to change her, we don't have diapers here." Schaper then asked the patient's daughter "Isn't that your mom, you should be willing to clean her." Schaper went on to tell the daughter that she needed to get her own diaper. The patient's daughter then went out to her car, got diapers and changed her mother. (Nhambiu Dep. Exh. 2.)

24. The patient's daughter ended her statement by saying that, from her observation of Schaper, "she spent the entire night attending to a specific group of people making sure their needs were met while others were totally ignored." (Nhambiu Dep. Exh. 2.)

**Disciplinary Proceedings**

25. Wilson forwarded the statement to the Emergency Department's Nurse Manager, Mairead O'Regan, and verbally discussed Schaper's conduct with O'Regan. (O'Regan Dep. at 32-33; Wilson Dep. at 125.) She also informed Jasen Nhambiu. (Wilson Dep. at 125.)

26. When sending the complaint from the patient's daughter to Nhambiu, Wilson told Nhambiu in the cover email dated July 21, 2015 that the "daughter sat at her mother's bedside all night and PCT Schaper in the carrying out of her duties did absolutely nothing for the patient; and in the morning when asked to assist with cleaning her she refused." (Nhambiu Dep. Exh. 3.)

27. A fact-finding hearing was held on July 31, 2015, to obtain Schaper's response to the July 7 incident. Attending the hearing was Schaper, her union delegate, Wilson, and a nursing supervisor. (Nhambiu Dep. Exh. 2.)

28. At the hearing, Schaper admitted that, when the patient's daughter asked her to help change the patient's diaper, she did not do so. (Nhambiu Dep. Exh. 2.)

29. Although Schaper at the hearing said that she told the patient's daughter she would come back in 10 minutes to help change the diaper, Schaper did not address the fact that she never did so. Schaper also failed to address the allegation by the patient's daughter that Schaper had ignored the patient throughout her shift. (Nhambiu Dep. Exh. 2.)

30. When asked at the hearing how Nurse Praddy got involved in the issue, Schaper said "I don't know." Schaper did acknowledge Praddy telling her "you didn't want to change the patient," but "gave no indication of any additional dialogue between herself and RN Praddy." (Nhambiu Dep. Exh. 2.)

**Schaper's Termination**

31. After the hearing, Jasen Nhambiu, as the Hospital's Director of Labor Relations, decided to terminate Schaper's employment. He based this decision on Schaper having committed the following three infractions:

a. Insubordination- failure to carry out the instructions of the Registered Nurse under whose jurisdiction she works.

b. Employee Behavior- Employees must interact professionally, courteously and appropriately, with patients, visitors and other employees. Employees must behave in a manner consistent with and furthering a positive perception of BLHC and its employees.

c. Exercising substandard performance in work responsibilities, which has a negative impact on patient care and/or hospital services. Failure to render assistance or care to a Patient.

(Nhambiu Decl Exh. 2.)

32. Under the Hospital's Rules of Conduct, the infraction of insubordination by an employee can result in the employee's termination. (Nhambiu Decl. Exh. 1.)

33. The Hospital formally informed Schaper of the termination of her employment in an August 11, 2015 conference. (Nhambiu Decl. Exh. 2.)

34. Subsequent to the termination, Schaper never pursued any grievance arbitration or other internal appeal to contest her determination. (Nhambiu Decl. ¶ 32.)

35. On August 3, 2015, 27 days after the July 7 incident, and four days after the fact-finding hearing, Schaper went to Labor Relations and lodged a discrimination complaint against Carol Wilson, contending that Wilson was harassing her because of her Hispanic national origin. (Nhambiu Decl. ¶ 33.)

36. This was the first time that Schaper had complained to Labor Relations about Carol Wilson. (Schaper Dep. at 58; Nhambiu Decl. ¶ 33.)

37. After her termination, Judith Schaper filed a charge of national origin discrimination and retaliation against the Hospital and Carol Wilson with the United States Equal Employment Opportunity Commission. (Nhambiu Decl. Exh. 34.)

38. On November 22, 2016, the EEOC determined that based "on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Nhambiu Decl. Exh. 35.)

## Conclusion

For all the reasons set forth above, and in the accompanying papers, Defendants urge this Court to grant summary judgment dismissal under Fed. R. Civ. P. 56 of Plaintiff's claims in their entirety.

Dated: Great Neck, New York
November 8, 2018

GARFUNKEL WILD, P.C.
*Attorneys for Defendants*

By: */s/ Roy W. Breitenbach*

Roy W. Breitenbach

111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200



5078999v.1