UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JUDITH SCHAPER, Case No: 17-cv-01246

Plaintiffs,

-vs.-

THE BRONX LEBANON HOSPITAL CENTER and CAROL WILSON

Defendants.
-------------------------------------------------------------X

Plaintiff, Judith Schaper, respectfully submits the following as and for her Responsive Statement pursuant to Local Rule 56.1(b) in opposition to Defendants' motion for summary judgment:

Introduction[1]

1. The Bronx-Lebanon Hospital Center, now known as BronxCare Health System (the "Hospital"), is a large not-for-profit health care system serving the South and Central Bronx, with 972 beds. The Hospital's ER responds to 139,000 visits annually. The Hospital's President and Chief Executive Officer is Miguel A. Fuentes. (Nhambiu Decl.,¶5.)

**Plaintiff's Response to Point 1**: Plaintiff has no basis to dispute the assertions in Point 1.

2. The Hospital is an equal opportunity employer. (Nhambiu Decl. Ex. 1.)

**Plaintiff's Response to Point 2**: Plaintiff concedes that the Hospital had a written policy reciting

[1] Plaintiff has carried the headings utilized by Defendants in their Local Rule 56.1 Statement of Material Facts over to this Responsive Statement.

a commitment to provide equal opportunity to the treatment of all employees without regard to their race or national origin, but generally disputes that it gave Plaintiff, a Hispanic female working under Carol Wilson, equal opportunity, generally based upon all of the supported factual contentions cited in this Responsive Rule 56.1 Statement.

Plaintiff's Hiring at the Hospital

3. The Hospital hired the Plaintiff, Judith Schaper, as a patient transporter on May 6, 2013. (Nhambiu Decl. Exh. 7.)

**Plaintiff's Response to Point 3**: Plaintiff concurs with Point 3.

4. As part of the Hospital's pre-hiring orientation process, Plaintiff on April 12, 2013 acknowledged receipt of the Employee Handbook and her obligation to read the Handbook. The Handbook included a Discrimination Complaints Policy, which states, in relevant part, "the Bronx-Lebanon Hospital Center provides employees with a means to express concerns when they feel discriminated against and an internal compliant procedure to have those concerns objectively heard and corrective action taken when appropriate or necessary." (Nhambiu Decl. Exh. 1.)

**Plaintiff's Response to Point 4**: Objection. Plaintiff concurs that she signed a form on April 12, 2013 acknowledging receipt of the Employee Handbook containing information on the several subjects, which included the Discrimination Complaints Policy. The Equal Employment Opportunity Policy Statement which Defendants included in their Exhibit "1", is not reflected on the receipt form Plaintiff signed, nor is the corresponding Manual Code Number reflected

thereon, BLHC[2] 0031-2. The Discrimination Complaints section the Hospital appended in its Exhibit "1", BLHC 0034-35, indicates that it was last reviewed on 1/4/16, almost 3 years after it was given to Plaintiff. It is also noted that in Plaintiff's First Request for Production of Documents, Document Request Number 4, Ex[3]. "2", Plaintiff requested complete copies of all the documents listed in the Acknowledgement of Receipt form exchanged as BLHC 0030, Ex. "14", in the form in which they were given to Plaintiff. To the extent Defendants did not have them in the same form, production in the closest form they did have was requested. Defendants' response was as follows:

> Defendants object to this Request as nonsensical. Defendants object to this Request that it is vague, overly broad and unduly burdensome. Defendants object to the extent that Plaintiff seeks information that is already within her possession, custody and control. Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney client privilege, the attorney work-product doctrine, or any other privileges, protections and exemptions from disclosure.

Pursuant to Fed.R.Civ.P 56(c)(2), Plaintiff objects to any of the documents, or any text quoted from them, as being inadmissible in evidence and therefore cannot be cited as supporting any fact upon this motion. Although Defendants included a blank Complaint Intake Form in Exhibit "1", BLHC 0036, there is no admissible evidence that this was in the document package given to Plaintiff before she was hired. Plaintiff also alleges that this policy was not followed here insofar as Jasen Nhambiu, the individual who had the power to authorize Plaintiff's termination, was personally aware of Plaintiff's intention to make a formal complaint against Carol Wilson for national origin discrimination but terminated her before she had the opportunity to do so. Consequently, the complaint was not investigated until an EEOC charge was filed and the case

[2] Throughout Plaintiff's Responsive Rule 56.1 Statement, "BLHC" followed by four digits refers to the Bates number assigned to the particular document(s) exchanged by the Hospital in Discovery. All references to "BLH" or the "Hospital" refer to Bronx Lebanon Hospital, which is the name it was known by at all times herein pertinent.

[3] All "Ex." references in this statement refer to Exhibits to the Declaration of William Cafaro.

was already in an adversary posture, and clearly no corrective action was taken during the time frame herein pertinent, despite the fact that corrective action was not only appropriate but necessary. Corrective action was taken, but well after the fact, by putting Carol Wilson on a Personal Improvement Plan, after which she resigned, *see*, additional factual allegations and supporting citations at ¶ 80, *et seq*., *supra*..

5. The Policy then goes on to set forth a detailed procedure for making and handling discrimination complaints. Under this procedure, Complaint Intake Forms are available in the Human Resources Division or on the Hospital-wide intranet. Completed forms are to be returned to the Assistant Vice President of Human Resources or the Director of Labor Relations. Complainants will be contacted to discuss the complaint in detail, but all complaints submitted will be maintained in confidence. All complaints will be investigated. (Nhambiu Decl. Exh. 1.)

**Plaintiff's Response to Point 5:** Plaintiff incorporates her response to the previous point by reference herein. She further points out that the availability of the form on the hospital intranet was not necessarily included in the version she received, which was almost three years older than the form Defendants included in their Exhibit "1" at BLHC 0035.

Plaintiff Becomes a Patient Care Technician

6. On March 9, 2015, Plaintiff was transferred to the position of patient care technician in the Hospital's Emergency Department. (Nhambiu Decl. ¶10.)

**Plaintiff's Response to Point 6:** Plaintiff was not transferred; she was promoted to patient care

technician ( abbreviated here as "PCT") on that date, as specifically stated in the Hospital's position letter to the EEOC. Ex. "25", BLHC 211. *See*, also Ex. "18", BLHC 0039, (BLHC Memo Re: ID & Fingerprinting from HR to Security) in the space after the words "EFFECTIVE DATE OF HIRE/TRANSFER" is the following handwritten notation: "3-9-15 (Prom)". It is Plaintiff's contention that this was an abbreviated form of the word "Promoted". Plaintiff also testified that becoming a PCT was a promotion. Schaper Dep. p. 29 LL3-13, Schaper Affidavit ("Schaper Aff.") at ¶ 5.

7. As a patient care technician, she received work assignments from the registered nurses in the Hospital's Emergency Department. (Nhambiu Decl.¶11; Ramagahan Dep. at 19.)

**Plaintiff's Response to Point 7:**

(i) On each shift, Plaintiff was assigned to a particular area within the emergency department, and would be assigned to that area for the whole night. Ex. "4", Schaper Dep. p. 32, L17 – p. 33 L4.

(ii) These assignments were made by her direct supervisor, Carol Wilson, who Plaintiff described as the Nurse Manager, Ex. "4", Schaper Dep. p. 32 L12 - p. 35 L8.

(iii) Carol Wilson's actual title was Patient Care Manager, Ex. ""6", Ramgahan Dep. p. 12, LL6-10.

(iv) Nurse Praddy, who is the nurse to whom the Plaintiff was allegedly insubordinate, testified that she had never been Judith Schaper's boss at BLH, Ex. "7", Praddy Dep. p. 11 LL8-10 and that she had never been a supervisor or a manager in any capacity at BLH p. 10 LL18-21.

(v) Plaintiff was also given assignments by doctors, Schaper Aff. at "35".

(vi) If an emergent assignment, such as a stat EKG, was given by a doctor, the Plaintiff had to drop everything and perform that task first. Ex. "8", Wilson Dep. p. 146 LL 10-15,

Schaper Aff at ¶ "35"

8. The registered nurses in the Hospital's Emergency Department reported to assistant nursing care coordinators in the Department. (Nhambiu Decl. ,¶11; Ramagahan Dep. at 19.)

**Plaintiff's Response to Point 8:**

On the shift in question here, Nurse Praddy testified that Carol Wilson, the Patient Care Supervisor, was her supervisor at the time. Ex. "7", Praddy Dep. p. 40 LL7-9, Ex. "6", Ramgahan Dep. p. 12, LL6-10.

9. The assistant nursing care coordinators reported to patient care managers in the Hospital's Emergency Department. (Nhambiu Decl. ¶12; Ramagahan Dep. at 19.)

**Plaintiff's Response to Point 9:** Plaintiff does not dispute this point.

10. From March through August 2015, the patient care managers in the Hospital's Emergency Department reported to Gagandra "Tony" Ramagahan, the Emergency Department's Assistant Nurse Manager. (Nhambiu Decl.,¶12; Ramagahan Dep. at 19.).

**Plaintiff's Response to Point 10:** Plaintiff does not dispute Point 10.

11. From March through August 2015, Tony Ramagahan reported to Margaret "Mairead" O'Regan, the Emergency Department's Nurse Manager. (Nhambiu Decl. **,r** 12; Ramagahan Dep. at 19.)

**Plaintiff's Response to Point 11:** Plaintiff does not dispute Point 11.

12. Although Mairead O'Regan was the Emergency Department's Nurse Manager, the final decision to terminate an employee engaging in wrongful conduct rested with Jasen Nhambiu in Labor Relations. (Nhambiu Decl. ¶ 13; O'Regan Dep. at 34.)

**Plaintiff's Response to Point 12:**

(i) Final authority to approve a recommendation to terminate an employee rested with Jasen Nhambiu in Labor Relations, Ex. "8", Wilson Dep. p. 78, LL11-22, p. 133 LL2-7.,

(ii) Jasen Nhambiu would never, in the ordinary course of events, fire a PCT unless a recommendation for termination were brought to his attention. Ex. "8", Wilson Dep. p. 133, LL8-15.

(iii) Carol Wilson had the discretion and was allowed to decide whether to initiate the termination process in connection with any particular offense or infraction, Ex. "8", Wilson Dep. p. 74 LL10-15.

(iv) Because Carol Wilson was Plaintiff's direct supervisor, any infraction or act that required the consideration of discipline would come to her first, Ex. "8", Wilson Dep. p. 77 LL4-8.

(v) In any scenario like this, in order to start the termination process, the decision would originate with Wilson and get to Ramgahan and O'Regan, Ex. "8", Wilson Dep. p. 77 L9 - p. 78 L8.

(vi) It was Wilson's opinion that Ms. Schaper should have been terminated for the

occurrence in question, Ex. “8”, Wilson Dep. p. 128 LL2-4.

(vii) Wilson expressed that opinion to Ms. O’Regan and to Mr. Ramgahan, Ex. “8”, Wilson Dep. p. 128 L8 - p. 130 L4.

(viii) Carol Wilson was the only person Jasen Nhambiu spoke to in connection with the termination decision, Ex. “5”, Nhambiu Dep. p. 52 LL5-12.

(ix) Carol Wilson and Jason Nhambiu were the only people who participated in the decision to terminate Plaintiff. Defendants’ Responses to Plaintiff’s First Set of Interrogatories, Interrogatory No. 5. Ex. “3”.

(x) Although the Interrogatory Responses were not verified, Nhambiu swore to all of the answers to the interrogatories at his deposition, Ex. “5”, p. 36 L13 – p. 37 L18.

13. The Emergency Department's registered nurses, assistant nursing care coordinators, and patient care managers all had the ability to assign, re-assign, and change work and work areas to patient care technicians, based upon patient demand, staffing, and the needs of the Emergency Department. (Nhambiu Decl. ¶ 14.).

**Plaintiff’s Response to Point 13:** Plaintiff does not dispute point 13.

14. The Hospital required its Emergency Department patient care technicians to wear scrubs of certain types, appearance, and colors. The Hospital reserved the right to discipline patient care technicians who failed to comply with these uniform requirements or otherwise wore ill-fitting scrubs while providing patient care. (Nhambiu Decl.¶ 15)

**Plaintiff’s Response to Point 14:**

(i) The "uniforms" were similar to scrubs, Ex. "5", Nhambiu Dep at p. 86 LL14-17.

(ii) Although Nhambiu testified that it was hospital policy not to wear uniforms which fit too tightly, he conceded that it was not common that female employees were admonished for this. Ex. "5", Nhambiu Dep. p. 87 L21 – p. 88 L2.

(iii) Plaintiff has consistently alleged that Wilson repeatedly said that Hispanic women were "always having to dress to show something" and "indicating the breast and buttocks area", in her EEOC charge, Ex. "22", BLHC 0098, in her complaint, Ex. "1" at ¶ 22, and in her testimony, Ex. "4", Schaper Dep. p. 43 LL10-19 and in her Affidavit, Schaper Aff. ¶¶ 17-22.

(iv) Wilson had also made similar comments to Soto-Johnson, who is also Hispanic and conversant in Spanish. Schaper Aff. at ¶¶ 17, 21.

(v) Soto-Johnson testified that Carol Wilson had asked why these Hispanic women are wearing scrubs so tight or why are they fitting their bodies that way, and that Wilson had made the same comment to Schaper. Ex. "11", Soto-Johnson Dep. p. 41 L 16 – p. 42 L 19.

(vi) Wilson never made comments like that to anyone else other than Schaper and Soto-Johnson. Ex. "11", Soto-Johnson Dep. p. 42 LL 20-5.

(vii) Many of the Jamaican, African, and African American women wore uniforms fitting more tightly Plaintiff's or Soto-Johnson's, but Schaper never witnessed or heard of any

of that type of comment being made to any of them. Schaper Aff. at ¶ 25.

(viii) Ms. Wilson acknowledged speaking to Ms. Schaper about her uniform being tight. Ex. "25", Hospital's EEOC Position statement, BLHC 0212, third paragraph, Ex. "5", Nhambiu Dep. p. 86 LL 4-9.

(ix) It was Nhambiu's understanding that Wilson admonished Schaper because "the uniform was appearing to be too tight in the buttocks and breast area, yes." He guessed that perhaps Schaper had gained weight after being measured for the uniform. Ex. "5", Nhambiu Dep. p. 87 LL 9-20.

(x) Nhambiu had no knowledge of Ms. Wilson saying this to any other employee. Ex. "5", Nhambiu Dep. p. 86 L4 - p. 88 L 21.

(xi) Contradicting Nhambiu and the Hospital's position statement, Wilson testified that she never had occasion to tell Ms. Schaper that her scrubs[4] were too tight, Ex. "8", Wilson p. 166 LL 4-7, 16-18.

(xii) According to Wilson, a manager can never [emphasis added] tell a female employee that her scrubs are too tight; that is something that you would have to refer to HR and have them deal with it; she would never consider doing that because of the HR repercussions it might create. Ex. "8", Wilson Dep. p. 167 L 9 -168 L L7.

15. The Hospital had a customer services policy prohibiting its

[4] Wilson referred to the uniforms only as scrubs, and in the PCT context, these terms were used interchangeably.

Emergency Department staff from publicly speaking languages other than English to each other in front of patients and visitors. (Nhambiu Decl., ¶ 16.)

**Response to Point 15:**

(i) The Hospital's position statement contains the following text:

> Ms. Wilson did acknowledge that she had to direct both Ms. Schaper and Ms. Soto-Johnson not to speak Spanish in the Emergency Room unless they were communicating to a Spanish speaking patient because many ***staff*** [emphasis added] and patients perceive them as being rude when they do that. Ms. Wilson further acknowledged that she had a similar conversation with Ms. Schaper when she was "off the clock" conversing with Ms. Soto-Johnson and another Hispanic Security Department staff member in Spanish in front of patients while in the hallways of the Emergency Department near the time clock, despite the fact that Ms. Schaper should not have been on premises because she was off-duty.

Ex. "25", BLHC 0212, 2nd para.

(i) Nhambiu testified that employees are not supposed to speak any other language in front of patients or visitors, even if they are on break or off duty. Although he testified that this was prohibited, it was not written down anywhere; it was discussed with employees in training orientation. Nhambiu's statement of the rule failed to mention that the prohibition applied in the presence of staff, as opposed to patients. Ex. "5", Nhambiu Dep. p. 70 L 13 – p. 71 L17.

(ii) When Wilson was asked if she would stop two nurses speaking some language other than English, her answer was that it depends if they are in the hallway talking, are in the lunchroom talking, or if they are in a patient care area. She said that it was very circumstance dependent, and she would not necessarily point it out at all, Ex. "8", Wilson Dep. p. 161 L17 – p. 163 L15.

(iii) When asked if it would be a violation of the rule if two PCT's were speaking their own language on a break, she said "absolutely not", and when asked if it would be a violation if a PCT was speaking Spanish to a security guard while she was on a break, she again replied "absolutely not." Ex. "8", Wilson Dep. p. 165 LL 9 - 21.

(iv) It should be noted that Point 15 of Defendants' Rule 56,1 statement, Nhambiu's Declaration at ¶ 16, and Wilson's statement of the rule as expressed in her testimony, Ex. "8", Wilson Dep. p. 165 LL 9-21, all fail to mention that the prohibition includes speaking other languages in front of staff.

(v) Wilson had told Plaintiff and Soto-Johnson on several occasions that they could not speak Spanish on breaks or in the lunchroom, despite the fact that no patients were present. Ex. "4", Schaper Aff at ¶ 23.

(vi) Schaper frequently observed other employees speaking languages other than English or Spanish in the presence of patients while they were obviously working, and this frequently happened in Wilson's presence without her voicing any objection or comment. Ex. "4", Schaper Aff. at ¶ 23.

(vii) Regardless of the time, place or circumstances, Wilson always stopped Schaper from speaking Spanish whenever she heard her. Schaper Aff at ¶ 23.

<u>The July 7, 2015 Incident</u>

16. On July 7, 2015, Judith Schaper reported to work the 12:00am shift as a patient care technician in the Hospital Emergency Department. One of the nurses she was assigned to work with was Renee Praddy. The patient care manager for the shift was

Defendant Carol Wilson. (Nhambiu Decl. ¶¶ 17-24.)

**Response to Point 16:** Plaintiff does not dispute Point 16.

17. Late in the shift, the daughter of an Emergency Department patient suspected of having suffered a stroke told Nurse Praddy that she had asked Schaper to help her change her mother, who had soiled her diaper, and Schaper refused. (Praddy Dep. at 17-18; Wilson Dep. at 103-05.)

**Response to Point 17:**

(i) On that shift, a woman who was afraid her mother was having a stroke drove her mother to the Hospital, Ex. "10", Harris Dep. p. 21 LL 3-6.

(ii) At some point, the patient's daughter (Raquel Harris, referred to herein as "Harris") asked Schaper to help change her mother, whose diaper was apparently wet. Ex. "4", Schaper Dep. p. 64 LL 3-5.

(iii) Shortly before Harris had made this request, Plaintiff noticed a patient with unstable vital signs, and called the attending physician, who told me he wanted a stat EKG now. Ex. "4", Schaper Dep. p. 63, L17- p. 64 L1.

(iv) Schaper replied: "Ma'am, if you give me five minutes I can help you, I have to do a STAT EKG, but we don't have diapers. I can provide you with chucks, we have chucks, and I will bring some warm water so you can wash her up, but I have to do a STAT[5]

[5] "Stat" is defined in Dorland's Illustrated Medical Dictionary, 30th Ed., as Latin *statim*, meaning at once, immediately. When the attending physician in question, Dr. Mukherjee, was asked if "stat" had a connotation of immediacy as it is normally used in the emergency room, he replied that it does. Mukherjee Dep. at 19:13-19:25.

EKG." Ex. "4", Schaper Dep. at 64 LL3-10.

(v) Chucks are square cotton barriers that absorb fluid. Ex. "7", Praddy Dep. p. 12 LL 3-22.

(vi) The use of diapers had been discontinued in the ER to avoid irritation to the patients' skin, Ex. "6", Ramagahan Dep. p. 55 L9 – p. 56 L3.

(vii) Wilson testified that in these circumstances if a PCT was directed to do these two tasks at the same time, the EKG would always take priority over cleaning the patient, because it was a matter of life and death, Ex. "8", Wilson Dep. p. 155 13-19 so Wilson's expectation was that the EKG should be done first and then the patient should be cleaned. Ex. "8", Wilson Dep. p. 149 LL13-17.

(viii) Wilson did not really know whether Schaper came back to change the patient or not after she did the EKG. Ex. "8", Wilson Dep. p. 148 LL4-12.

(ix) Plaintiff had produced a letter6 from Dr. Koustav Mukherjee, the attending physician in the Emergency Room, which says as follows: "On 7/7/2015, I had asked Ms. Schaper for an emergent EKG, which she performed in a very timely manner. The shift was the first working day after the holiday weekend, and it was unusually busy; there were delays in all aspects of patient care and I was grateful to be able to get the EKG quickly." The letter goes on to praise Schaper's professionalism and team-player mentality. Ex. "36", Bates stamped as PLTF 1114.

[6] This letter is admissible as a party admission because Dr. Mukherjee was a hospital employee, so it falls outside the hearsay definition as a party admission, see, FRE 801(d)(2). Moreover, Dr. Mukherjee authenticated it. Mukherjee Dep. p. 13 L2 – p. 14 L3.

(x) When Nhambiu was asked if Schaper's claim that she had been directed to do an emergent EKG was investigated, he said it was investigated at the time by Ms. Wilson and Mr. Ramgahan, but they were unable to ascertain whether or not the EKG was ordered at the same time as the request to change the soiled patient was made. Ex. "5", Nhambiu Dep. p. 74 L9 - p. 75 L10.

(xi) Wilson did not recall making any effort to ascertain this at all, and said that it would not have mattered to her at the time anyway. Ex. "8", Wilson Dep. p. 154 L24 - p. 155 L18.

(xii) There is absolutely no evidence in the case that Ramgahan made any effort to ascertain this, and he did not recall any mention of an EKG. Ex. "6", Ramgahan Dep. p. 59.

(xiii) Schaper noticed that a patient had unstable vital signs, and advised Dr. Mukherjee, who shouted at her that he wanted a STAT EKG now, Ex. "4", Schaper Dep. p. 63 L19 – p. 64 L2, Schaper Aff at ¶ 33, Ex. "36" PLTF 1114.

(xiv) Something like a patient's vital signs being unstable would usually be entered in the chart. Ex. "12", Mukherjee Dep. p. 21 L19 – p. 22 L3.

(xv) Dr. Mukherjee testified that when a patient has unstable vital signs and an EKG is administered, it should always be charted7, Ex. "12", Mukherjee Dep. p.24 LL2-21, but it might or might not be charted depending upon the need to perform more urgent tasks in caring for other patients, Ex. "12", Mukherjee Dep. p. 25LL 13-18.

(xvi) After the EKG, the doctor directed Schaper to take the patient to the Code Room which

[7] Which would mean logging the data into the Hospital's electronic medical record keeping system, Mukherjee Dep. p.20 LL 20-25.

is the area where the most serious cases are cared for, Ex. “12”, Mukherjee Dep. p. 27 L22 – p. 28 L2. Ex. “4”, Schaper Dep. at p. 66 LL 20-5.

(xvii) If the doctor had been asked at the end of the shift, he could very easily have found that patient’s name, but with the passage of time, that became impossible. Ex. “12”, Mukherjee Dep. p. 36 LL10-15.

(xviii) If the doctor had been asked at the end of his shift, which ended at 7:00AM, Ex. “12”, Mukherjee Dep. p. 17 LL19-25 to find the patient’s name, he could easily have done so, Id., p. 36 LL5-15, but even after a few days, without a direct recollection, it would have been extremely difficult. Id., p. 36, L16 – p. 37 L7.

(xix) Harris’ written statement confirms that Ms. Schaper had to do an EKG that evening and would come back as soon as she was done. (“The PCT informed me that she was busy doing EKG’s [emphasis added] and as soon as she was finished she would get back to me.”) Ex. “19”, BLHC 0055.

18. Praddy then went to speak about the issue with Schaper, who was on rounds going from patient to patient. Schaper categorically told Praddy that she was not going to assist the patient's daughter, and was not going to clean the patient. Praddy warned Schaper that the patient's daughter could complain about her refusal to change the patient, but Schaper told Praddy "I don't care she can do whatever she wants but I am not cleaning her." (Nhambiu Decl. Exh. 2; *see also* Praddy Dep. at 18-22; Wilson Dep. at 105.).

**Response to Point 18:**

(i) Praddy had merely assumed that Schaper was on rounds going from patient to patient, because Praddy saw her walking between one patient and another, but did not know that this was, in fact what was happening. Ex. "7", Praddy Dep. p. 22 LL7-17,.

(ii) After Schaper had done the EKG, Nurse Praddy asked her if she refused to change a patient. Plaintiff replied, "no, not at all, I had a STAT EKG to do as per Dr. Mukherjee. Ex. "4", Schaper Dep. p. 64LL 12-15, Schaper Aff. at ¶ 38.

(iii) Dr. Mukherjee had read the EKG strip and had told Schaper to take the patient to the Code Room. Ex. "4", Schaper Dep. p. 67 LL 15-21.

(iv) While Schaper was doing these things, Nurse Praddy asked her if she had refused to change a soiled patient. Schaper said no, not at all, that she was doing a stat EKG as per Dr. Mukherjee. Praddy told her that the woman was upset and might go complain to Wilson. Schaper said something to the effect of "if she does, she does; I didn't do anything wrong and I have to do what I was directed to do by the doctor" Schaper Aff. at ¶ 38, Ex. "4", Schaper Dep. at p. 64 LL 11-22.

(v) After moving the stat EKG patient to the Code Room, Schaper returned to the area and asked Harris if she still needed help changing her mom. She replied "No thank you, I don't need your help. The nurse helped me." Schaper Aff at ¶ 39, Ex. "4", Schaper Dep. p. 67 L 15 - p. 68 L 13.

(vi) Wilson had no idea whether Schaper had been directed to do an EKG by any doctor at the point in time when Nurse Praddy discussed the daughter's complaint with her, she didn't recall making any effort to find out, and affirmatively stated that it would not

have mattered to her anyway. Ex. "8", Wilson Dep. p. 74 L9 - p. 75 L10.

19. Ultimately, two nurses assisted the patient's daughter. (Nhambiu Decl. Exh. 2; Harris Dep. at 7-9.)

**Plaintiff's Response to Point 19:** Plaintiff has no knowledge of who changed the patient.

20. Praddy then brought the issue to Carol Wilson's attention, near the end of the shift, and told Wilson that the patient's daughter wanted to speak with Wilson. (Praddy Dep. at 23; Wilson at 103.)

**Plaintiff's Response to Point 20**: Plaintiff has no knowledge in this regard**.**

21. Wilson then spoke with the patient's daughter, who told Wilson that her mother had been in the Emergency Department all night and had not been attended to by Schaper. (Wilson Dep. at 107-08.) Wilson asked the patient's daughter to write out a statement. *(Id.* at 118.)

**Plaintiff's Response to Point 21**:

(i) Schaper has no knowledge of what Harris told Wilson.

(ii) Schaper moved the patient (Harris' mother) away from a noisy psychiatric patient before she was requested to change her, Ex. "4", Schaper Dep. p. 63 LL14-20, Schaper Aff at ¶ 34.

(iii) Schaper gave the patient in question a blanket before being requested to change the diaper. Ex. “4”, Schaper Dep. at p. 63 LL14-20, Schaper Aff at ¶ 41.

(iv) After Schaper had finished administering the EKG and moving that patient to the Code Room as the doctor had ordered, she returned and asked Harris if she still needed help with the diaper. She replied “No thank you, I don’t need your help. The nurse helped me.” Ex. “4”, Schaper Dep. p. 67 L15 - p. 68 L13; Schaper Aff at ¶ 39.

22. In the statement, dated July 7, 2015, the patient's daughter wrote that she asked Schaper "if my mom could be changed because she uses diapers." Schaper responded that "she was busy doing EKG's and as soon as she was finished she would get back to me. So again I said to her my mom is wet and she has not been changed all night, from after 8pm until after 5pm this morning (Nhambiu Dep. Exh. 2.)

**Plaintiff’s Response to Point 22:** Plaintiff agrees that the statement written by Harris so reflects, and Plaintiff agrees making, in sum and substance, the statement attributed to her in Point 22.

23. According to the patient's daughter, Schaper went on to state that "In the Emergency [Department], we don't do that, you will have to change her, we don't have diapers here." Schaper then asked the patient's daughter "Isn't that your mom, you should be willing to clean her." Schaper went on to tell the daughter that she needed to get her own diaper. The patient's daughter then went out to her car, got diapers and changed her mother. (Nhambiu Dep. Exh. 2.)

**Plaintiff's Response to Point 23:**

(i) Plaintiff concedes that the patient's daughter's statement so reflects. Schaper vehemently denies, however, that she told the patient's daughter "we don't do that, you will have to change her". Ex. "4", Schaper Dep. p. 100 LL10 - 22, Schaper Aff. at ¶ 36.

(ii) Plaintiff admits she said that they didn't have diapers in the Emergency Room, and after Plaintiff told her that she would have to do the EKG first, she explained that they used chucks in the ER, and Schaper may have told the patient's daughter that she would have to get her own diaper if she didn't want a chuck used, Schaper Aff at ¶ 36.

(iii) Plaintiff reiterates that they do not have diapers in the ER, and incorporates subpoints (iv) through (vi) from her Response to Point 17, and the corresponding supporting references, supra, herein by reference.

(iv) Schaper vehemently denies that she ever told the patient's daughter that she should do it herself because she's your mother. Ex. "4", Schaper Dep. p. 100 LL10-22, Schaper Aff. at ¶ 36.

24. The patient's daughter ended her statement by saying that, from her observation of Schaper, "she spent the entire night attending to a specific group of people making sure their needs were met while others were totally ignored." (Nhambiu Dep. Exh. 2.)

**Plaintiff's Response to Point 24:**

(i) Plaintiff concedes that the quoted language appears in Harris' written statement.

(ii) By making that statement, Harris meant that the PCT spent the entire night tending to the Hispanic patients and ignoring the black patients. Ex. "10", Harris Dep. p. 26 LL11-16.

(iii) In Wilson's covering July 21, 2018 e-mail to Nhambiu which included Harris' written statement she said "It has racist undertones". Ex. "35", BLHC 1034.

(iv) Wilson conceded that she made absolutely no effort to corroborate whether or not Ms. Shaper had, in fact, neglected Harris' mother throughout the entire shift. Ex. "8", Wilson Dep. p. 113 LL 7-13

(v) On every shift, entries are made in the electronic medical record system by PCT's when vital signs are taken, when blood or urine is taken for analysis, or if other orders are given and carried out. In the ordinary course of events, entries will appear for each patient and for each PCT for each shift. Each entry in the electronic record keeping system includes the time made and the identity of the person making the entry, Schaper Aff at ¶ 42.

(vi) If Wilson had warned Schaper at the end of the shift that she intended to pursue discipline against her for these accusations, or if Wilson had investigated Harris' allegations promptly, Schaper would have had the opportunity to point out the entries she made in the black patients' charts on that shift. Schaper Aff at ¶ 43.

(vii) Because it was not done at the end of the shift, it would be impossible to identify the patients Schaper was responsible for in the Emergency Room on that shift or find their medical records. Shaper Aff at 44.

(viii) Harris knew which PCT was assigned to help her because she pays attention to who takes care of her mom. Ex. "10", Harris p. 39 LL17-24.

(ix) When she got to the Hospital, they pointed to the PCT who was assigned, the one who was the subject of her testimony, and Harris watched this PCT who had ignored her for whole time, roughly eight to ten hours. Ex. "10", Harris Dep. p. 40 L9 - p. 42 L5.

(x) When Harris got to the Hospital, it was still light out8. Ex. "10" Harris Dep. p. 40 LL6-11, but Schaper's shift did not begin until midnight. Ex. "4", Schaper Dep. p. 31 LL12-14, Defendants' Local Rule 56.1 Statement, Point 16.

(xi) Harris testified that her mom's diaper usually gets changed between every two to four hours. Ex. "10", Harris Dep. p. 21 LL12-16. The first time she was changed that night, Harris did it herself, before midnight. Id., p. 37, LL5-7.

(xii) Harris' written statement said her mom had not been changed all night from after 8PM until after 5AM this morning, Ex. "19", BLHC 0055.

(xiii) Wilson is a black female of Jamaican national origin, Hospital's Position Statement with the EEOC, Ex. "25", BLHC 0211

(xiv) The patient's daughter, Harris, is a black female from Antigua, another island in the British West Indies, Ex. "10", Harris Dep. p. 26 LL17-21.

<u>Disciplinary Proceedings</u>

---

[8] www.timeanddate.com indicates that sunset on July 7, 2018 occurred at the Bronx Zoo at 8:29PM. The Court is requested to take judicial notice of this pursuant to FRE 201(b)(2).

25. Wilson forwarded the statement to the Emergency Department's Nurse Manager, Mairead O'Regan, and verbally discussed Schaper's conduct with O'Regan. (O'Regan Dep. at 32-33; Wilson Dep. at 125.) She also informed Jasen Nhambiu. (Wilson Dep. at 125.)

**Plaintiff's Response to Point 25**: Plaintiff does not dispute Point 25.

26. When sending the complaint from the patient's daughter to Nhambiu, Wilson told Nhambiu in the cover email dated July 21, 2015 that the "daughter sat at her mother's bedside all night and PCT Schaper in the carrying out of her duties did absolutely nothing for the patient; and in the morning when asked to assist with cleaning her she refused." (Nhambiu Dep. Exh. 3.)

**Plaintiff's Response to Point 26**:

(i) Carol Wilson's July 21, 2015 e-mail to Nhambiu says "Please see attached the letter of complaint from the family member regarding PCT Schaper – It has racist undertones". Ex. "35", BLHC 1034.

(ii) It continues "The daughter sat at her mother's bedside all night and PCT Schaper in the carrying out of her duties did absolutely nothing for the patient all night; and in the morning when asked to assist with cleaning her she refused. Ex. "35", BLHC 1034.

(iii) At her deposition, Wilson conceded that she made absolutely no effort to corroborate whether or not Ms. Shaper had in fact neglected this patient throughout the entire shift. Ex. "8", Wilson Dep. p. 113 LL7-13. She merely assumed it to be true and conveyed it

to Nhambiu, the final decision maker, as a fact. Id., p. 112 L7 - p. 113 L13, Ex. "35", BLHC 1034.

(iv) In that same covering e-mail Wilson says "I have spoken to her with Tony [Ramgahan] as my witness because her attitude was one of disgust toward me. Whenever I would approach her and ask her to do something there was always a very insolent pushback. That has not changed much, barely acknowledges when I speak with her. Just rude." Ex. "35", BLHC 1034.

(v) Contradicting this, Wilson testified that she was not aware of Schaper acting unprofessionally or disrespectfully to any patients, patient's relatives, any hospital visitors or employees either before or after the date in question. Wilson also testified that she could not recall any occasion, either before or after the date in question, where Schaper was insubordinate in any way. Ex. "8", Wilson Dep. p. 70 L10 – p. 72 L9.

27. A fact-finding hearing was held on July 31, 2015, to obtain Schaper's response to the July 7 incident. Attending the hearing was Schaper, her union delegate, Wilson, and a nursing supervisor. (Nhambiu Dep. Exh. 2.)

**Plaintiff's Response to Point 27**:

(i) Plaintiff admits that a meeting took place on July 31, 2015 at which the July 7 incident was discussed, and that the people listed above were present.

(ii) Plaintiff denies that this "fact finding hearing" was held to obtain Schaper's response, because Schaper had already explained what happened to Carol Wilson that morning.

Wilson said "nothing you need to worry about. There's no trouble, just what happened?" Schaper explained what had happened, and she said "Okay, no problem". Ex. "4", Schaper Dep. p. 64 L23 – p. 65 L3; Schaper Aff. at ¶ 40.

(iii) Carol Wilson, was the only person present at this meeting who had any input into the decision to terminate Ms. Schaper, Ex. "8", Wilson Dep. p. 121 LL5-9,;

(iv) At the meeting, Schaper told Wilson that she had a letter from Mukherjee indicating that he had told her to do the EKG. She said that it didn't matter, that she didn't need to see it, and she would even accept a copy. Ms. Wilson showed no interest in hearing Schaper's side of the story. Schaper Aff at ¶ 38; Ex. "36", PLTF 1114.

28. At the hearing, Schaper admitted that, when the patient's daughter asked her to help change the patient's diaper, she did not do so. (Nhambiu Dep. Exh. 2.)

**Plaintiff's Response to Point 28**:

(i) Objection. The document is inadmissible as it cannot be authenticated as there is no evidence as who prepared the document and whether it is an accurate record of what was said at the meeting. The document also constitutes inadmissible hearsay.

(ii) Nhambiu was not present at the meeting and consequently has no knowledge of what happened at the meeting other than what he read from BLHC 0190. Ex. "8", Wilson Dep. p. p. 120L16-22, Ex. "24", BLHC 0190.

(iii) The document, indicates that Schaper said she was asked to do a stat EKG, that Schaper told the daughter to give her 10 minutes and should come and help. Ex. "24", BLHC

0190

(iv) Plaintiff reiterates that after moving the EKG patient to the Code Room, she returned to the area and asked Harris if she still needed help changing her mom. She replied “No thank you, I don’t need your help. The nurse helped me.” Schaper Aff at ¶ 39, Ex. “4”, Schaper Dep. p. 67 L15 - p. 68 L13.

29. Although Schaper at the hearing said that she told the patient's daughter she would come back in 10 minutes to help change the diaper, Schaper did not address the fact that she never did so. Schaper also failed to address the allegation by the patient's daughter that Schaper had ignored the patient throughout her shift. (Nhambiu Dep. Exh. 2.)

**Plaintiff’s Response to Point 29**:

(i) Objection. The document is inadmissible as it cannot be authenticated as there is no evidence as who prepared the document and whether it is an accurate record of what was said at the meeting. The document also constitutes inadmissible hearsay.

(ii) Plaintiff reiterates that after moving the EKG patient to the Code Room, she returned to the area and asked Harris if she still needed help changing her mom. She replied “No thank you, I don’t need your help. The nurse helped me.” Schaper Aff at ¶ 39, Ex. “4”, Schaper Dep. p. 67 L15 - p. 68 L13.

(iii) From reading the document, BLHC 0190, Schaper did address why she did not change the diaper; she was ordered to do a stat EKG by a doctor. The diaper had apparently been changed while she was doing a more important task upon which someone’s life

may have depended. Schaper Aff. at ¶ 33, Ex. “8”, Wilson Dep. p. 155 LL13-18, Ex. “24”, BLHC 0190.

(iv) Moreover, the document is clear that the Plaintiff stated moved the patient to a quieter part of the hospital and gave the patient a blanket. Ex. “24”, BLHC 0190 (final paragraph).

(v) The questions that Plaintiff stands accused of not answering fully do not even appear in the document.

30. When asked at the hearing how Nurse Praddy got involved in the issue, Schaper said "I don't know." Schaper did acknowledge Praddy telling her "you didn't want to change the patient," but "gave no indication of any additional dialogue between herself and RN Praddy." (Nhambiu Dep. Exh. 2.)

**Plaintiff’s Response to Point 30**:

(i) Objection. The document is inadmissible as it cannot be authenticated as there is no evidence as who prepared the document and whether it is an accurate record of what was said at the meeting. The document also constitutes inadmissible hearsay.

(ii) The Court is referred back to the document, Ex. “24”, BLHC 0190, and Plaintiff cannot be blamed for failing to completely answer questions that do not even appear in the document, and it should not be assumed that the notes from the meeting are complete, as if they were a transcription.

(iii) While Plaintiff was performing the tasks that Dr. Mukherjee ordered her to do, Nurse

Praddy told Plaintiff she needed to speak to her. Praddy asked herif she had refused to change a soiled patient, and Plaintiff responded to the effect of no, not at all, that she was doing a stat EKG as per Dr. Mukherjee. Nurse Praddy told Plaintiff that the woman was upset and might go complain to Wilson. Plaintiff said something to the effect of "if she does, she does, I'm not doing anything wrong and I have to finish what I was directed to do by the doctor". Ex. "4", Schaper Dep. p. 64 LL11-22, Schaper Aff at ¶ 38.

Schaper's Termination

31. After the hearing, Jasen Nhambiu, as the Hospital's Director of Labor Relations, decided to terminate Schaper's employment. He based this decision on Schaper having committed the following three infractions:

a. Insubordination- failure to carry out the instructions of the Registered Nurse under whose jurisdiction she works.

b. Employee Behavior- Employees must interact professionally, courteously and appropriately, with patients, visitors and other employees. Employees must behave in a manner consistent with and furthering a positive perception of BLHC and its employees.

c. Exercising substandard performance in work responsibilities, which has a negative impact on patient care and/or hospital services. Failure to render assistance or care to a Patient.

(Nhambiu Decl Exh. 2.)

**Plaintiff's Response to Point 31**:

Plaintiff agrees that Nhambiu based the termination decision upon these grounds stated in Point 31 of Defendants' Local Rule 56.1 Statement, as well as upon other information which was provided verbally and in writing to him by Carol Wilson in the July 21, 2015 e-mail. Ex. "35",

BLHC 1034. Plaintiff further incorporates her response to Point 12, *supra*.

32. Under the Hospital's Rules of Conduct, the infraction of insubordination by an employee can result in the employee's termination. (Nhambiu Decl. Exh. 1**.)**

**Plaintiff's Response to Point 32**:

(i) The document appended to the moving papers as Exhibit 1 does not contain the list of infractions, which is appended to the Cafaro Decl. as Ex. "20", BLHC 0058-61. The infractions are divided into categories A and B, A being the more serious ones. Insubordination appears in both lists. List A says that the listed conduct "will warrant the imposition of appropriate disciplinary action up to and including discharge." List B says that "violations in this category may be subject to a series of Corrective Actions (progressive discipline) depending upon the individual situation. Situations that are deemed to be extreme by Human Resources may result in termination even in this category".

(ii) People are not normally terminated for insubordination. Ex. "8", Wilson Dep. p. 93 LL7-18.

(iii) Rendering inadequate care or failure to render adequate care might or might not result in termination, depending on the circumstances. Ex. "9", O'Regan Dep. p. 95 L21 – p. 96 L8.

(iv) With respect to insubordination, O'Regan was asked the following questions and gave the following answers:

Q. So when you say, "progressive discipline," if the employee has not

> been insubordinate in the past, as a general proposition, and there is an incident of insubordination, would that employee normally be given a warning, say if you are insubordinate again you're going to be fired?
> A. Well, if they had nothing else in their folder, no. It's a progressive. You do a verbal, then there's written, and then there's suspensions, and then there's termination.
> Q. So that progression you've just given us would be the normal disciplinary progression, correct?
> A. Yes, And it's all overseen by human resources, labor management.

Ex. "9", O'Regan Dep. p. 96 L10 – p. 97 L18.

(v) After the incident occurred, Wilson told Nurse Praddy to write down what had happened. Nurse Praddy refused. Ex. "7", Praddy Dep. p. 25 L19 - p. 26 L11, Ex. "37", BLHC 0052. This was clear insubordination which had no repercussion whatsoever.

33. The Hospital formally informed Schaper of the termination of her employment in an August 11, 2015 conference. (Nhambiu Decl. Exh. 2.)

**Plaintiff's Response to Point 33**:

Schaper had no awareness that termination was being considered for this occurrence until she was told at the August 11, 2015 meeting. Schaper Aff at ¶ 46, Ex. "8", Wilson Dep. p. 184 L7 - p. 185 L5.

34. Subsequent to the termination, Schaper never pursued any grievance arbitration or other internal appeal to contest her determination. (Nhambiu Decl. ¶ 32.)

**Plaintiff's Response to Point 34**:

Plaintiff admits Point 34.

35. On August 3, 2015, 27 days after the July 7 incident, and four days after the fact-finding hearing, Schaper went to Labor Relations and lodged a discrimination complaint against Carol Wilson, contending that Wilson was harassing her because of her Hispanic national origin. (Nhambiu Decl.¶ 33.)

**Plaintiff's Response to Point 35**:

Plaintiff admits the allegations in Point 35.

36. This was the first time that Schaper had complained to Labor Relations about Carol Wilson. (Schaper Dep. at 58; Nhambiu Decl. ¶ 33.)

**Plaintiff's Response to Point 36**:

(i) Plaintiff admits that this was the first time she had complained to Labor Relations about Carol Wilson, but she had made numerous previous verbal complaints in this regard to Mairead O'Regan and to Tony Ramgahan.

(ii) Before the July 7 incident, Schaper complained about Wilson assigning her to watch four one on one patients at the same time to Tony Ramgahan. Ex. "4", Schaper Dep. p. 47 L24 – p. 48 L12, Schaper Aff. at ¶ 11-2.

(iii) Before the July 7 incident, Schaper complained to O'Regan because Wilson had directed her to watch 2 one on one patients. She told me that this should not be happening because it was a safety concern for both the employee and the patients. Ex. "4", Schaper Dep p. 47 L24 – p. 48 L12. Schaper Aff at ¶ 13-4.

(iv) Before the July 7 incident, Schaper complained to O'Regan because Wilson had sent her to do something while she was with a one on one patient, and when Schaper asked

what about her patient, Wilson replied that she would stay with the patient. When Schaper returned Wilson was not there and the patient was alone. Schaper was very concerned because she could have been fired for this, so she spoke to O'Regan, who said she would look into it. Ex. "4", Schaper Dep. p. 40 LL5-16, Schaper Aff. at ¶16.

(v) Before the July 7 incident, Schaper went to Tony Ramgahan's office and complained about Wilson's statement to the effect that Hispanic women get where they are because they dress with their breasts showing, and whatever they have on their backsides is really tight. Tony said that he would look into it because we don't tolerate racial comments in the hospital. Ex. "4", Schaper Dep. p. 44 LL5-20, Schaper Aff. ¶¶ 17-8.

(vi) Before the July 7 incident, Schaper complained to both Tony Ramgahan and Mairead O'Regan that Carol Wilson had asked Schaper "Why do you people always have to wear your clothes so tight? Schaper related that she felt she was a target because Wilson didn't like Hispanic women. Schaper Aff at ¶ 19-20.

(vii) Before the July 7 incident, Schaper complained to Tony Ramgahan and Mairead O'Regan that Wilson had stopped her from speaking Spanish to a patient who was Hispanic. They said that they would look into it. Schaper Aff. at ¶ 26.

(viii) Before the July 7 incident, Schaper complained to a charge nurse in the ER whose name she could not remember about Wilson mimicking her Spanish in front of a Hispanic patient, which nearly caused an incident. Schaper Aff at ¶ 27.

37. After her termination, Judith Schaper filed a charge of national origin

discrimination and retaliation against the Hospital and Carol Wilson with the United States Equal Employment Opportunity Commission. (Nhambiu Decl. Exh. 34.)

**Plaintiff's Response to Point 37**:

On October 21, 2015 and on April 13, 2016, Plaintiff filed a charge of national origin and race discrimination, hostile work environment, and retaliation against the Hospital and Carol Wilson with the United States Equal Employment Opportunity Commission. Ex. "20", BLHC 0095-99.

38. On November 22, 2016, the EEOC determined that based "on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Nharnbiu Decl. Exh. 35.)

**Plaintiff's Response to Point 38**:

Objection. EEOC determinations are not admissible evidence and should not be considered. *See, Woodell v. United Way of Dutchess County*, 357 F. Supp. 2d 761, 772 n.15 (S.D.N.Y. 2005) (according EEOC Determination no weight "because it was sparse and conclusory and provides no indication of what the EEOC's investigation actually involved" (quotation marks and citations omitted)); *Wanamaker v. Columbian Rope Co.*, 907 F. Supp. 522, 538 n.24 (N.D.N.Y. 1995) (giving no weight to EEOC Determination because there was no legal basis for its finding).

<u>PLAINTIFF'S SUBMISSION OF ADDITIONAL MATERIAL FACTS</u>

Plaintiff Judith Schaper respectfully submits the following additional paragraphs pursuant

to Local Rule 56.1 (b), continuing the numerical sequence used in Defendants' Statement.

39. Plaintiff is a Hispanic woman. Hospital's Rule 56.1 Statement, Point 2, Schaper Aff at ¶ 47. She is, in all respects, qualified to perform all the essential job functions of a PCT, and is fully able to do all aspects of the job. Schaper Aff. ¶ 5.

Schaper's Employment History at the Hospital

40. Before Plaintiff was promoted to PCT, she had worked as a Patient Transporter since May 6, 2013 within the same hospital. Ex. "13", BLHC 0001, Defendants' Local Rule 56.1 Statement, Point 3, Nhambiu Decl. ¶ 7.

41. The job description of a Patient Transporter is as follows: Under direct supervision of the Resource Center Director, provides prompt and safe transport of patient throughout the hospital facility and performs all functions related to patient transport including assisting nursing staff with transfer, connection/disconnection of oxygen under direction of nursing staff and maintaining and cleaning the stretchers and wheelchairs. Non-Management Job Description Ex. "21", BLHC 0065. These duties also included assisting nursing staff with transferring patients to and from beds, stretchers and wheelchairs. *Id*., BLHC 0064.

42. In her performance evaluation as a Patient Transporter dated 8/19/13, Ex. "26", BLHC 0269 - 0273, she met all job responsibilities, including interacting professionally and maintaining positive relationships with patients, visitors and other employees, and displaying a

polite spirit of service attitude toward patients and co-workers, and maintaining friendly, efficient and responsive attitudes toward patients while performing job duties.

43. The appraiser's written comments in the blank space provided in the form read as follows: "Judy, keep on communicating with your peers and supervisors the way you do daily. You are a great asset to the team, you are always willing to help others. Ex. "26", BLHC 0272.

44. In her performance evaluation as a Patient Transporter dated 5/22/14, she again met all job responsibilities reflected in ¶ 41 above. Ex. "21", BLHC 0063-4.

45. In that evaluation, the appraiser's written comments in the blank space provided in the form read as follows: "Judy, keep up the good work. You are always willing to give an extra hand when needed. You are a great asset to the team." Ex. "21", BLHC 0067.

46. Plaintiff had no education beyond the eleventh grade, but she took her GED in December 2010, Ex. "4", Schaper Dep. p. 23 LL14-20, Schaper Aff. at ¶ 2. While working as a Patient Transporter, Plaintiff attended ABC Training Center on Fordham Road in the Bronx, and took the curriculum required to become a PCT, and passed the exam. She attended the classes and studied on her own time and paid the tuition for the course herself, and successfully earned the certificate enabling her to become a PCT. Ex. "4", Schaper Dep. p. 25 LL3-25, Schaper Aff. at ¶ 4.

47. According to the Hospital's position statement to the EEOC, the Labor Relations investigation showed that Ms. Schaper's performance was largely well regarded. Ex. "25", BLHC 0211.

48. Carol Wilson was completely unable to recall any criticism she had of Ms. Schaper's performance either before or after the date of the occurrence at issue in the case. She was similarly unable to recall any incident in which she saw Ms. Schaper act rudely or unprofessionally toward any patient, patient's relative, or any employee in any way. She was not aware of any incident in which she was alleged to be insubordinate in any way either before or after the date in question. Ex. "8", Wilson Dep. p. 70 L14 – p. 72 L8.

49. Nurse Praddy, who worked the same shift as Plaintiff once or twice a week, said she was a good PCT and always seemed willing to help, never saw her behave rudely toward anyone or disrespect any supervisor in any way. Nurse Praddy testified that Plaintiff cleaned soiled patients on many occasions, and never objected to doing this or tried to avoid doing it. Nurse Praddy could not think of any reason why she would object to cleaning a soiled patient. Ex. "7", Praddy Dep. p. 13 L14 – p. 16 L10.

50. Although Plaintiff's probationary period had been extended for attendance issues, Schaper disputes that the absences were unauthorized, and claims that O'Regan had approved some of the days off in question in advance. Ex. "4", Schaper Dep. p. 96 L17 – p. 97

L4.

51. Plaintiff's attendance as a Patient Transporter had been counted against her in the decision to extend her probation. Although they "look at the employee as a whole" in making this decision, her performance as a Patient Transporter, as opposed to her attendance, had been disregarded, even though it could easily have been looked up in the records. Ex. "6", Ramgahan Dep. p. 36 L3 - p. 42 L12. Ramgahan acknowledged that there were no competency or behavioral issues with Schaper as a PCT, and could not cite any reason for extending her probation other than attendance. *Id*., p. 39 LL 4-11.

52. Before it went to Labor Relations, Ramgahan, conjunctively with Carol Wilson and Mairead O'Regan, made the decision to extend Schaper's probation in the first instance. Ex. "6", Ramgahan Dep. p. 24 LL3-11, but Ramgahan had very limited contact with Schaper on the job, and consequently very limited knowledge of her performance as a PCT. *Id*., p. 44 LL2-46, and O'Regan had no personal interaction with her other than the exchange of greetings. Ex. "9", O'Regan Dep. p. 19 L15 - p. 20 L20.

<u>The Hostile Work Environment Ms. Schaper Endured</u>

53. On approximately five or six occasions pointed out to Schaper that her scrubs were too tight. Schaper Aff at ¶¶ 17-22.

54. On each of those occasions, she said either Hispanic women or "you people"

"always dress to show something", "are exposing their body parts', or some words to that effect, and on two of those occasions, pointed to her own buttocks area while making comments of this nature. Schaper Aff. at ¶¶ 17-22.

55. Defendant Wilson stated that Hispanic women only get where they are because they dress to show their breasts and wear tight clothes around their backsides. Schaper Aff. at ¶ 17.

56. Wilson referred to Plaintiff and/or both Plaintiff and Soto-Johnson as "you people" at least 10 times over the time she was Ms. Schaper's supervisor. On at least one of those occasions, she specified that "you people" meant Hispanic people. .Schaper Aff. at ¶ 24.

57. Defendant Wilson also singled out Hispanics by admonishing Ms. Schaper and Ms. Soto-Johnson from speaking Spanish during breaks and whenever she heard it. This included admonishing Ms. Schaper for speaking Spanish to a Spanish speaking patient. Schaper Aff at ¶¶ 26-30.

58. She also sarcastically mimicked Ms. Schaper speaking Spanish on at least 3 or 4 occasions. On at least one or two occasions, she did this in front of other employees, and once in front of a patient. Schaper Aff. at ¶¶ 27-8.

59. Defendant Wilson threatened Ms. Schaper and other Hispanics with termination

for doing their normal job duties. This would include a refusal to watch multiple one on one patients. Schaper Aff at ¶ 15.

60. Defendant Wilson regularly removed Ms. Schaper from her assigned post to cover other assignments, leaving the original posts vacant, and leaving numerous tasks that should have been done on her originally assigned area undone. This would obviously reflect poorly upon Plaintiff, who had been assigned to that area. For example, Defendant Wilson once removed Ms. Schaper from a one on one patient to run an errand for Defendant Wilson stating that she (Defendant Wilson) would stay with the patent. When Ms. Schaper returned from running the errand, she found the one on one patient without any supervision. This is especially troubling as it put patient safety at risk. When psychiatric or intoxicated male patients came in, the rule was two PCT's had to be assigned to each such patient, unless a male PCT was available. A male PCT could be assigned to such a patient alone, but a female PCT could not be assigned to such a male patient alone. A female PCT being assigned to multiple one on one patients compounded the risks presented. Schaper Aff. at ¶¶ 8, 15-6.

<u>The Infraction Clearly Did Not Warrant Termination</u>

61. When he made the firing decision, Nhambiu believed that ER management had investigated Schaper's claim that she had been directed to do an emergent EKG, and that they were unable to verify that the EKG order was made at the same time as the diaper change request. Ex. "5", Nhambiu Dep. p. 74 L9 - p. 75 L10.

62. Plaintiff incorporates subpoints (vii) through (xviii), inclusive, of Plaintiff's Response to Point 17, *supra*, regarding the management failure to investigate this, to ascertain the name of the EKG patient, or to check if the time of the EKG had been charted, as well as the Hospital's refusal to even look at Dr. Mukherjee's letter that Plaintiff had furnished, Ex. "6", PLTF 1114.

63. Nhambiu was asked the following question and gave the following answer:

> Q. If you had believed Ms. Schaper's assertion that she had said I will come back and change the patient after I give the EKG, you would not have terminated her, correct?
> A. That would have been a circumstance - - yeah, that would have been a mitigating circumstance to not terminate her, correct.

Ex. "5", Nhambiu Dep. p. 76 LL2-10.

64. Nhambui was asked if he now had a better idea of what Schaper's position was than he did when he made the firing decision, and answered as follows "I would say that's correct, but I would say even prior to hearing Ms. Schaper's testimony, I had conversations with emergency department management. I had conversations with, you know, people in the hospital, and they would have been - - there were possibilities of other remedies for Ms. Schaper. Ex. "5" Nhambiu Dep. p. 93 L13 - p. 94 L4.

65. Nurse Praddy, to whom Schaper was allegedly insubordinate, did not think the "incident" warranted any discipline whatsoever, let alone termination. She gave the following testimony:

> Q. When you related this incident to Carol Wilson, did you believe that Ms. Schaper would be fired for this?
> A. No.
> What, if anything, did you think would happen as a result of what you said to Carol Wilson?
> A. I just thought Ms. Wilson would have spoken to Ms. Schaper and it would have been resolved.

Ex. "7", Praddy Dep. p. 37 LL9-18.

****

> Q. You assumed that she would speak to her about it and that would be the end of it; correct?
> A. That's what I would assume, yes.

*Id.*, p. 39 L24 – p. 40 L5.

Plaintiff's Retaliation Claims

Labor Relations Complaint

66. Plaintiff made numerous verbal complaints to management before the July 7 incident. Verbal complaints aside, the parties agree that Schaper first formal discrimination complaint to Labor Relations was made on August 3, 2015. Plaintiff's Counterstatement of Material Facts at ¶ 36. Plaintiff specifically refers the Court to Plaintiff's Counterstatement of Material Facts at ¶ 36 (ii) – (viii).

67. Schaper made that complaint against Carol Wilson based upon the fact that she was being discriminated against due to her ethnicity to Nhambiu personally. Ex. "5", Nhambiu Dep. p. 94 L21 – p. 95 L11.

68. Nhambiu made the final firing decision at some point between the July 31, the date of the "fact finding" meeting, and August 11, 2015, the date of Schaper's termination. He was unable to give any idea of the when, in that interval, he made the decision. Ex. "5", Nhambiu Dep. p. 45 LL7-11.

69. Defendants have therefore failed to exclude the possibility, for the purposes of Rule 56, that the final firing decision was not made as a result of this discrimination complaint.

Retaliation After Plaintiff's EEOC Filing

70. Plaintiff filed her EEOC Charge on October 21, 2015 and then filed the same charge again on April 13, 2016. Ex. "22", BLHC 0092 - 0099.

71. Dr. Mukherjee had written a very laudatory letter of recommendation[9] for Schaper on or about October 13, 2016, specifically complimenting her professionalism and excellence in her performance as a PCT, Ex. "29", BLHC 0675-6.

72. Because Dr. Mukherjee knew that she was represented by an attorney, before sending it he thought he decided to stop and check with his superiors because it might cause him a political problem at the hospital to get involved in a legal case. Ex. "12", Mukherjee Dep. p. 42 LL 14-23.

[9] The letter of recommendation made no mention of the case or the incident in question.

73. Because he was afraid that it might conflict with his employer's interests to write the letter, he e-mailed his boss, the Chairman of the Emergency Department, Dr. John Coffey, Ex. "12", Mukherjee Dep. p. 47 LL18-23, and asked if it was okay to write a letter on behalf of a PCT, *Id.*, p.43 L17 - 44 L20.

74. The e-mail Dr. Mukherjee wrote to Dr. Coffey on October 12, 2016 had the subject line: "is it okay to write a letter on behalf of a pct?", identified Ms. Schaper and the fact that she had been let go, and included the following text: "My concern is about the purpose of this reference letter because she said it was for her attorney. I thought she was a great technician and was such an asset to the department, but I also do not want to cause a conflict with my employer." Ex. "28", BLHC 0670. Dr. Coffey's initial reply was "Absolutely. Thanks so much. We will pass this on shortly. Much appreciated." Ex. "28", BLHC 0671.

75. Dr. Coffey's subsequent reply was "Let me discuss with you in person tomorrow so I can more fully understand the implications. Don't do anything for now. My first reading was cursory and I somehow skipped the legal twist. My fault. Let's discuss in person first. Ex. "28", BLHC 0673.

76. Dr. Coffey's final response in the exchange is "Please do write any letters. I will explain tonight!". Ex. "28", BLHC 00674.

77. Although Dr. Mukherjee denied any recollection of whether he met with Dr. Coffey after that e-mail or whether he had any further discussion with Dr. Coffey about why he should not write the e-mail on Judith Schaper's behalf. Pursuant to that direction from Dr. Coffey, he did not write any such letter. Ex. "12", Mukerjee Dep. p. 52 L4 – p. 53 L11.

78. In a text message to Soto-Johnson dated October 13, 2016, Dr. Mukherjee wrote as follows: "hey…big problem. so I am not allowed to write a letter on behalf of judy. this is from coffey's mouth. i will talk to him in person today to clarify, but unfortunately as of now, i am not allowed to write anything." Ex. "27", BLHC 0669.

79. In his testimony, Dr. Mukherjee authenticated the letter of recommendation, the e-mail exchange, and the screen shots from the text exchange from his cell phone, from which all of the documents in the preceding eight paragraphs were taken. Ex. "12", Mukerjee Dep. p. 47 L4 - p. 50 L2. All of the foregoing documents were produced by the Hospital in discovery.

Accusations of Bias and Favoritism Against
<u>Wilson by Management Leading to Her Resignation</u>

80. Carol Wilson was hired at BLH on January 20, 2015, Ex. "30", BLHC 0715, and resigned [under duress] (brackets from her resignation letter) effective September 24, 2016, Ex. "31", BLHC 0800.

81. O'Regan was prompted to ask for a meeting with Ms. Wilson because "some of

the staff thought Ms. Wilson had favorites and she was not rotating the staff as they should be," Ex. "9", O'Regan Dep. p. 55 LL12-21. O'Regan was unable to recall whether the nurse who had made this comment to her was Hispanic or not. *Id.*, p. 57 LL 3-18.

82. The only subject she recalled being discussed at the meeting between herself and Wilson was the issue of favoritism, i.e., what she called using her go-to people to get things done. Ex. "9", O'Regan p. 58 L10- p. 59 L6. The meeting was about a month before Wilson left the Hospital, *Id.*, p. 55 LL2-5.

83. Approximately a month after that meeting, O'Regan drafted a Performance Improvement Plan "just, you know, talking about favoritism and that sort of thing." Ex. "9", O'Regan p. 64 L11-19.

84. In the draft, O'Regan she had determined that Wilson's performance was unacceptable in 6 critical elements, the first being entitled "Respect Staff as Professionals". Included in that paragraph was the following: "you must refrain from discussing challengers [sic] with other employees or being bias [sic] & not impartial in your approach. Ex. "34", BLHC 1029. The third point includes the following text: "As a PCM you should attempt to resolve conflicts in real time. No one likes confrontations, but your bias of some individuals is noted by the staff." BLHC 1029. The fifth paragraph is entitled "Be honest, fair, consistent and reasonable". It reads as follows in its entirety: "Showing favoritism toward particular members of the staff is devastating to the relationship between PCM [patient care manager] and staff.

Unpredictable PCM escalates tension and inhibits work.” BLHC 1030.

85. The document also says that “by the end of the opportunity period, you have brought your performance up to successful level on the elements is which you’re currently unacceptable in order to avoid a reduction in grade, removal or reassignment.” Ex. “34”, BLHC 1029, Ex. “9”, O’Regan Dep. p. 83 LL15-24. O’Regan said the PIP period would probably have been 30 days. Ex. “9”, O’Regan Dep. p. 87 L17 – p. 88 L7.

86. O’Regan testified that the PIP memo in question was just a first draft on her computer, and that it was never issued to anyone at the Hospital or redrafted because Wilson chose to resign before they got to that stage. Ex. “9”, O’Regan Dep. p. 88 LL8-15. She was not aware of any other document that was prepared by anyone in the hospital with a respect to a PIP for Ms. Wilson, *Id*., p. 90 LL16-21, and she had never discussed the issue of a PIP for Wilson with Jasen Nhambiu, *Id*., p. 89 LL15-19.

87. In sharp contradiction to O’Regan’s testimony:

(i) Nhambiu was not only aware of the PIP; he said a final decision reached was to put Ms. Wilson on a PIP, Ex. “5”, Nhambiu Dep. p. 28 LL9-18; he had not only discussed it with O’Regan; he was even involved in an advisory capacity; *Id*., p. 27 L19 - p. 28 L3

(ii) He felt the performance review was warranted, and concurred that if Wilson did not improve within the PIP period that her termination would be warranted. Ex. “9”, Nhambiu Dep. p. 32 LL5-14.

88. Rosaline Soto-Johnson, also a PCT, had made a claim against Wilson for discrimination based upon ethnicity dated four days after Schaper's termination which contains the following text: "Finally, I would like to address the issue of race as it pertains to Carol Wilson and her supervision practices. Basically, there are two types of employees in the emergency room Native African African American and other is terms of the way Ms. Wilson treats her subordinates. The Native African and African American employees are given preferred treatment such as: counseling instead of disciplinary action, leniency, and over all support. Where as other non African employees are treating with hostility, alienation, and over all inequality". Ex. "33", BLHC 0988.

89. The investigation conducted dutifully concluded that Ms. Wilson was not a racist, there is a bold large font heading entitled "Concerns from the staff/some were addressed at our last meeting with Ms. O"Regan and Mr. Ramgahan". The first item on this list is "Ms. Wilson has her favorites", and the second is "Rotation of assignments in the ER are not being done equitably. Ex. "32", BLHC 0984.

Dated: New York, New York
January 7, 2019

**LAW OFFICES OF WILLIAM CAFARO**

/s/______________________________
William Cafaro, Esq.
*Attorneys for the Plaintiff*
108 West 39th Street, Suite 602
New York, New York 10018
Tel: (212) 583-7400
Fax: (212) 583-7401
E-mail:BCafaro@CafaroEsq.com